**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GARRETT COLLICK, NOAH WILLIAMS, and NANCY WILLIAMS, | Civ. No. 16-471 (KM) (JBC) |
| Plaintiffs, | |
| v. | OPINION |
| WILLIAM PATERSON UNIVERSITY, KATHLEEN M. WALDRON, ROBERT FULLEMAN, ELLEN DESIMONE, WILLIAM PATERSON UNIVERSITY POLICE DEPARTMENT, JOHN DOES 1-20 (names fictitious as presently unknown), employees, representatives, and/or agents of defendant WILLIAM PATERSON UNIVERSITY POLICE DEPARTMENT, JANE DOES 1-20 (names fictitious as presently unknown), employees, representatives, and/or agents of defendant WILLIAM PATERSON UNIVERSITY POLICE DEPARTMENT, JOHN SMITH 1-5 (names fictitious as presently unknown), employees, representatives, agents, and/or spokespersons of defendant WILLIAM PATERSON UNIVERSITY, and JANE SMITH 1-5 (names fictitious as presently unknown), employees, representatives, agents, and/or spokespersons of defendant WILLIAM PATERSON UNIVERSITY, | |
| Defendants. | |

**KEVIN MCNULTY, U.S.D.J.:**

The manner in which colleges address allegations of sexual assault on campus is an issue of great public concern. Now before this Court, however, is

1

a motion like any other—in particular, a motion to dismiss the complaint for failure to state a claim upon which relief may be granted, under Federal Rule of Civil Procedure 12(b)(6). (ECF no. 14) It is not the Court's task on this motion to determine whose account is more credible. Indeed, the opposite: for purposes of such a motion, "[t]he only issue before the Court now is whether the Complaint, *if* we assume its allegations are true, states a legal claim. *Whether* the allegations are true can be determined only after the parties exchange discovery and the case is decided, either by summary judgment or trial."[1]

The campus in question here is that of William Paterson University ("WPU"). The primary plaintiffs, Garrett Collick ("Collick") and Noah Williams ("Williams"), are two male WPU students who were accused of having engaged in non-consensual sex with a female classmate. Collick and Williams were arrested by university police officers and charged with sexual assault and other crimes. A grand jury declined to indict them. WPU, however, ultimately expelled them. The claims in the Complaint (ECF nos. 1-1 and 1-2)[2] arise from those criminal and university disciplinary processes.

Collick, Williams, and Collick's mother, Nancy Williams ("Ms. Williams"), bring this suit against WPU; the WPU Police Department ("University Police"); WPU's President, Kathleen M. Waldron; its Director of Public Safety and University Police, Robert Fulleman ("Director Fulleman"); and a University Police Detective Sergeant, Ellen DeSimone ("Det. Sgt. DeSimone"). Also named

---

[1]    *Evans v. City of Newark*, No. 14-00120, 2016 WL 2742862, at *1 (D.N.J. May 10, 2016).

[2]    Record items cited repeatedly will be abbreviated as follows:

Compl. = Complaint (ECF nos. 1-1 and 1-2)

Def. Mot. = Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF no. 14-5)

Pl. Opp. = Memorandum of Law in Opposition (ECF no. 17)

Def. Reply = Defendants' Reply Brief (ECF no. 20)

as defendants are some two dozen other employees, representatives, or agents of WPU's administration and the University Police.

The Complaint asserts some twenty-one causes of action. Collick, Williams, and Ms. Williams allege that the WPU Defendants have violated their rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX"), the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1985 ("Section 1985"), 42 U.S.C. § 1986 ("Section 1986"), the New Jersey Law Against Discrimination, and the New Jersey Constitution and laws. They also assert multiple common law tort and contract based causes of action.

For the reasons set forth below, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. I dismiss without prejudice certain defectively pleaded claims, or parts of claims: Counts 11 and 17 are dismissed in their entirety; Counts 1, 2, 3, 4, 6, and 8 are dismissed in part to the extent they are based on racial discrimination or theories of substantive due process or equal protection/racial discrimination; Count 10 is dismissed as to the *respondeat superior* liability of WPU and the University Police only; and Count 12 is dismissed as to Plaintiffs' relationship with WPU only. The remainder of the Complaint will go forward.

## I.  BACKGROUND

In considering a motion to dismiss, the Court is required to treat the facts alleged in the Complaint as true and to draw all reasonable inferences in the plaintiffs' favor. I summarize those allegations as follows:

### A. The Matriculation of Collick and Williams at WPU

WPU is a public, coeducational college located in Wayne, New Jersey. (Compl. ¶ 28) In late November 2014, Collick and Williams, both male, were 18-year-old freshmen at WPU, in good academic and financial standing. (*Id.* ¶ 1) Both Collick and Williams enrolled at WPU as members of the Educational Opportunity Fund Program ("EOFP"), "a program instituted to offer students from disadvantaged backgrounds the tools and financial support needed to

3

succeed in college." (*Id.* ¶ 35) EOFP-related loans of $11,000 and $4,000, respectively, enabled Collick and Williams to attend WPU. (*Id.* ¶¶ 50, 60) Collick also worked at WPU's dining hall, earning approximately $8.35 per hour. (*Id.* ¶ 53)

## B. Student Code of Conduct and Sexual Violence Policy

As WPU students, Collick and Williams were subject to WPU's Student Code of Conduct 2014-2015 ("Student Code of Conduct") and the Domestic/Dating Violence, Stalking and Sexual Violence Policy ("Sexual Violence Policy"). (*Id.* ¶36) These documents govern WPU's investigations and disciplinary proceedings. (*Id.* ¶ 47)

The Sexual Violence Policy provides that "Students accused of . . . sexual violence: will be treated with fairness and respect. The University will ensure that its investigations and disciplinary proceedings comply with due process requirements." (*Id.* ¶ 39) This policy also establishes the process WPU must use when investigating and prosecuting claims of misconduct:

> Disciplinary sanctions for violations of this . . . sexual violence policy and/or of the student code of conduct will be imposed in accordance with applicable [WPU] policies, including but not limited to, expulsion or termination of employment. The University's determination shall be based on the preponderance of evidence in the case. [WPU] typically conducts a full investigation within sixty days of receiving a complaint. Additional time may be necessary depending of the complexity of the investigation and the severity and extent of . . . sexual violence. Both parties will be simultaneously provided with written notification of the outcome of the investigation/proceeding and, if applicable, either party may file an appeal within three days. Both parties will be given periodic status updates on the investigation. The appropriate University disciplinary process is determined by the status of the person accused of engaging in . . . sexual violence. If the accused is a student, the complaint is addressed with the procedures for student discipline as set forth in the University's Student Code of Conduct.

(*Id.* ¶ 40) Similarly, the Student Code of Conduct establishes that:

> [T]he threshold utilized for determining responsibility for alleged policy violations will be the "preponderance of the evidence." This means that the hearing officer will weigh all information available

4

about an incident and ask if the violation is more likely than not to have occurred. If the answer is affirmative, then the student(s) will be found responsible for the violation.

(*Id.* ¶ 41) The Student Code of Conduct also assures WPU students that "[t]he University will guarantee procedural fairness in all its disciplinary actions." (*Id.* ¶ 42)

### C. Encounters Between Collick and Williams and Jane Doe

During their freshman year, Collick lived in WPU's Overlook North dormitory, and Williams lived in the Overlook South dormitory. (*Id.* ¶¶ 26-27) "Jane Doe,"[3] a female first-year student, also lived in Overlook South. (*Id.* ¶¶ 2, 52) Both Collick and Williams first met Jane Doe during their first semester at WPU, and both had participated in consensual sexual activity with Doe before the night of November 25, 2014. (*Id.* ¶¶ 54-55, 62-63) Jane Doe had initiated the sexual relationships with both Collick and Williams, and some of the consensual sexual activities in both relationships had involved other male WPU students as well. On at least one occasion prior to November 25, 2014, Collick, Williams, and Jane Doe jointly participated in sexual activity. (*Id.* ¶¶ 56-58, 64-66) Between such sexual episodes, Jane Doe "inundated" Collick with messages, via text message and otherwise, seeking sex. Most of these Collick rejected. (*Id.* ¶ 59)

On November 24, 2015, Jane Doe hoped to engage sexually with Collick and, for that purpose, attempted to call him thirty-three times. (*Id.* ¶¶ 68-69) Later that evening and into the early morning of November 25, 2014, Collick and Williams were watching television with three other male WPU students in a friend's room in the Overlook South dormitory. (*Id.* ¶ 67) While those five were watching TV, Jane Doe entered, turned off the lights and TV, closed the blinds, and invited Collick to have sex with her in her room, but he declined. (*Id.* ¶¶ 70-72) Jane Doe then "initiated consensual sex on Collick," and subsequently participated in consensual sexual activities with Williams and the other three

---

[3]      The name is fictional, to protect privacy. Doe is not a party to this action.

male students. (*Id.* ¶¶ 73-74) Afterward, Williams and another male student accepted—but Collick declined—an invitation from Doe to come back to her room, where Williams then had additional consensual sex with Doe. (*Id.* ¶¶ 75-77) Williams then returned to his room. (*Id.* ¶ 78) Afterward, Jane Doe, Collick and Williams, and the three other first-year students remained on good terms. (*Id.* ¶ 4) Later on November 25, 2014, Jane Doe "visited Williams' dormitory and other nearby rooms looking for Collick who was not there." (*Id.* ¶ 79)

### D. Defendants' Investigation of Allegations by Doe

University Police is a police organization "responsible for servicing and protecting William Paterson's campus and its community." (*Id.* ¶ 29) Director Fulleman was "responsible for implementing, overseeing, and supervising all laws and safety procedures" at WPU, and DeSimone was a sergeant on the force. (*Id.* ¶¶ 31-32)

On November 25, 2014, shortly before 2 p.m., Jane Doe falsely reported the events of the prior evening and early morning to the University Police as rape and sexual assault. (*Id.* ¶¶ 5, 80) Defendants' investigation was limited to receiving Jane Doe's report; it "did not include interviews of other students, a review of videotapes from the dorm, an analysis of any cell phone records, an examination of [Jane Doe's] blogs or other social media profiles, or any investigation into previous relations between [Jane Doe] and Collick and Williams." (*Id.* ¶ 83) However, "interviews with other students would have revealed that [Jane Doe] was very sexually active at William Paterson, had many sexual partners, engaged in sexual activities with more than one partner on multiple occasions, had to change dormitory rooms because her roommate was uncomfortable with the level of [Jane Doe's] sexual activity, had previous sexual relations with plaintiffs, was known to use illicit drugs, and would have

demonstrated that plaintiffs committed no wrongdoing and, thus, [that Jane Doe's] accusations were false." (*Id.* ¶ 84)[4]

Prior to their eventual arrest, Collick and Williams were not interviewed or questioned regarding the accusations, were not notified of any investigation pending against them, and were not given an opportunity to deny the sexual assault allegations. (*Id.* ¶ 82, 93-94) More generally, Defendants did not treat Collick and Williams fairly or respectfully in the course of any investigation. (*Id.* ¶ 91) "In essence, [D]efendants rushed to judgment, considered plaintiffs Collick and Williams guilty solely on [Doe's] report, and gave little thought, if any, to the investigation and discovery of the actual facts involved." (*Id.* ¶ 22)

On November 28, 2014, Det. Sgt. DeSimone applied for arrest warrants, which were issued by a judge. (*Id.* ¶ 81) At no point during Defendants' investigation did "anyone corroborate [Doe's] allegations or speak to potential witnesses," obtain or review security camera footage from the Overlook South dormitory, or seek exculpatory evidence. (*Id.* ¶¶ 87-89) Further, at no point during the investigation into Jane Doe's allegations did the University Police follow "rape kit" procedures. (*Id.* ¶ 90)

### E. Arrest, Imprisonment, and Grand Jury Presentation

On November 29, 2014, University Police arrested Collick and Williams while they were off-campus during Thanksgiving break. They were placed in handcuffs, but were not told the reason for the arrest. (*Id.* ¶¶ 96-97, 101) Ms. Williams witnessed the arrest of her son, Collick. (*Id.* ¶ 102) As a result, she "suffered severe emotional distress," then and later. (*Id.* ¶ 115)

University Police returned Collick and Williams to WPU's campus, questioned each for at least twenty minutes, and held them for at least an hour in handcuffs. (*Id.* ¶¶ 98-99, 101) Neither became aware of the reason for their arrest until an arresting officer mentioned Jane Doe's name. (*Id.* ¶ 100)

---

4       The use of an accuser's history of promiscuity to vitiate a sexual assault charge, even at trial, is highly problematic. *See, e.g.,* Fed. R. Evid. 412; N.J. R. Evid. 412. For present purposes, however, it is unnecessary to discuss that issue further.

Collick and Williams were then taken to Passaic County Jail and booked. (*Id.* ¶ 105) Collick was charged with four counts of aggravated sexual assault, one count of aggravated criminal sexual contact, one count of conspiracy to commit sexual assault, and one count of criminal restraint. (*Id.* ¶¶ 9, 103) Williams was charged with two counts of aggravated sexual assault, one count of first degree kidnapping, one count of conspiracy to commit sexual assault, and two counts of criminal restraint. (*Id.* ¶¶ 10, 104)

Initially, Plaintiffs' bail was set at $200,000, but later lowered to $25,000. Collick and Williams spent nine days in Passaic County Jail, until December 9, 2014, when their families helped them make bail. (*Id.* ¶¶ 106, 108-09, 114) While in jail, Collick and Williams spent five days in general population and four days in medium security. (*Id.* ¶ 106) During their imprisonment, "Collick and Williams were extremely scared and frightened for their lives . . . , and they slept in shifts to attempt to protect one another." (*Id.* ¶ 107) As a result, both students "suffer[ed] immeasurable and permanent emotional and psychological trauma." (*Id.* ¶ 113)

The matter was presented to a Passaic County grand jury. On January 26, 2014, the grand jury declined to indict Collick and Williams, returning no bill. (*Id.* ¶ 110)

### F. WPU's Student Disciplinary Actions

On November 29, 2014, Jennifer Tumlin, WPU's Director of Student Conduct and Dispute Resolution, issued Collick and Williams a Notice of Interim Suspension. The Notice cited "a serious incident" on WPU's campus, and informed them that they had been "temporarily suspended" and banned from entering WPU's grounds and facilities until the school's disciplinary process adjudicated the case, because they were deemed to be clear and present dangers to the community. (*Id.* ¶¶ 12, 85) The Notice also stated that Collick and Williams needed to contact Ms. Tumlin's office "as soon possible to arrange to meet to discuss the university's adjudication process thoroughly." (*Id.*) The Notice was issued based on the University Police's "incomplete and

improper" investigation. (*Id.*)

University President Waldron was "responsible for all aspects of student life at WPU," and "her decisions, statements, instructions, and/or edicts constituted policy" of WPU. (*Id.* ¶¶ 30, 169) On November 30, 2014, the day after the Notice of Interim Suspension was issued, President Waldron issued a public statement asserting that a crime had occurred on campus and offering her condolences to Jane Doe:

> On November 25, 2014, a sexual assault of a female student allegedly took place in a residential hall on our campus. Five male students who were living in the residence halls have been arrested and charged. As soon as the victim reported this incident, she was attended to by university counselors and police officers. All of the alleged perpetrators of this heinous crime have been barred from campus. Prosecution is being handled by the Passaic County Prosecutor's office and the university is fully cooperating in the prosecution. I am angry and dismayed that this crime was committed on our campus and allegedly by students. My deepest concern is for the victim of this criminal act who has courageously stepped forward to take legal action and seek justice. No expression of anger or sadness on my part can alleviate the harm done to the victim and my heart goes out to her and her family. I offer the full support of the University community. William Paterson University - its students, faculty, staff, and board of trustees - is horrified by this alleged sexual assault. Our University is a place of learning and personal growth where individuals are respected. It is our responsibility to provide a safe environment for all its members and to be a campus where students can grow and thrive. We are committed to ensuring that William Paterson University will always be a place where students feel safe and sound. This commitment extends from our classrooms to our residence halls and to everywhere on campus.

(*Id.* ¶ 13, 86)

Although Defendants' investigation did not yield sufficient evidence to meet the preponderance of the evidence burden established in the Student Code of Conduct (*Id.* ¶ 95), WPU expelled Collick and Williams. (*Id.* ¶¶ 18, 111)

## G. Plaintiffs' Other Injuries and Losses

As additional results of Defendants' actions, Collick's and Williams's "entire academic careers have been ruined, and their overall economic futures

9

are severely compromised"; they were "shunned from campus"; they suffered reputational damage; and their future interpersonal relationships will be impaired. (*Id.* ¶¶ 112-13, 119, 122-24) Further, Collick and Williams lost a year of their college education, and the financial resources they expended to get into and attend WPU were "wasted and lost without any compensation or return." (*Id.* ¶¶ 117-18)

## II.   APPLICABLE STANDARD

FED. R. CIV. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

FED. R. CIV. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See Id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a

'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal,* 556 U.S. at 678 (2009).

The United States Court of Appeals for the Third Circuit, interpreting the *Twombly/Iqbal* standard, has provided a three-step process for analyzing a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See* [*Iqbal,* 556 U.S.] at 675; *Argueta* [*v. U.S. Immigration & Customs Enforcement,* 643 F.3d 60, 73 (3d Cir. 2011)]. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal,* 556 U.S. at 679; *Argueta,* 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679; *Argueta,* 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

*Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir. 2012).

## III.   ANALYSIS

In Section III.A, *infra,* I deny WPU's motion to dismiss all counts on sovereign immunity grounds.

Section B covers civil rights counts that allege racial or gender discrimination (Counts 1, 3, 4, 8). I partly grant the motion to dismiss those counts to the extent they are based on racial discrimination, but deny the motion to dismiss to the extent they are based on gender discrimination.

Section C covers civil rights claims relating to the criminal charges and the WPU disciplinary process (Counts 2, 6). These counts are sustained to the extent they rest on Fourth Amendment, procedural due process, and equal protection/gender discrimination grounds. The motion to dismiss is granted, however, to the extent these counts rest on theories of substantive due process or equal protection/racial discrimination.

Section D covers the liability of WPU, the University Police, and supervisory personnel liability for civil rights violations by lower level

11

employees, and for declaratory relief (Counts 5, 7, 15, 21). As to these, the motion to dismiss is denied.

Section E covers state common law causes of action (Counts 9–14, 16–20). As to Counts 9, 13, 14, 16, 18, 19, and 20, the motion to dismiss is denied. As to Count 10 (malicious prosecution), the motion to dismiss is granted as to *respondeat superior* liability of WPU and the University Police, but otherwise denied. As to Count 12 (tortious interference), the motion to dismiss is granted as to Plaintiffs' relationship with WPU, but denied as to Plaintiffs' relationship with EOFP. As to Counts 11 (abuse of process) and 17 (negligent infliction of emotional distress), the motion to dismiss is granted. Because Count 17 is the only count in which Nancy Williams is named, the Clerk will dismiss her as a party.

### A. Sovereign Immunity

WPU, as a State university, argues that all of the claims against it are barred by sovereign immunity. (Def. Mot. at 62-65) WPU concedes in its reply brief that by removing this case to federal court, it waived its immunity from suit in federal court under the Eleventh Amendment. *Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008). WPU correctly notes, however, that it retains the "defenses it would have enjoyed had the matter been litigated in state court, including immunity from liability," *i.e.*, sovereign immunity. *Lombardo*, 540 F.3d at 198.[5]

The question, then, is whether WPU is entitled to invoke the State's sovereign immunity under New Jersey law. In *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989), the Third Circuit provided an analytical framework for determining whether a State entity, such as a public university, is entitled to Eleventh Amendment immunity. New Jersey courts have adopted an identical framework to analyze sovereign immunity. *See Royster v. New Jersey State Police*, 439 N.J. Super. 554, 579, 110 A.3d 934,

---

[5]     Various state law tort immunity doctrines are discussed separately in Section III.E, *passim*.

948 (App. Div. 2015) (although the New Jersey Appellate Division was "not bound by lower federal court decisions" it applied *Fitchik* to state sovereign immunity analysis "in an attempt to create 'judicial comity' and to avoid forum shopping"). I therefore start from the premise that the Eleventh Amendment case law, though not literally applicable, is highly relevant to the interpretation of the analogous state law of immunity.

I previously considered whether WPU is entitled to Eleventh Amendment immunity in *Brennan v. William Paterson Coll.*, 34 F. Supp. 3d 416 (D.N.J. 2014). As I explained there:

> Whether WPU, a public university, is a state entity for Eleventh Amendment purposes . . . "is a fact-intensive review that calls for [an] individualized determination[]." *Bowers v. NCAA,* 475 F.3d 524, 546 (3d Cir. 2007). Although the facts as to different universities may differ, it is instructive that, as to two major institutions in the State system, the federal courts have found that immunity does not apply. *See Kovats v. Rutgers, State University,* 822 F.2d 1303, 1312 (3d Cir. 1987) (Rutgers); *Bostanci v. N.J. City Univ.,* 2010 WL 4961621, *1, 2010 U.S. Dist. LEXIS 126693, *2–3 (D.N.J. Dec. 1, 2010) (New Jersey City University). *But see Nannay v. Rowan College,* 101 F. Supp. 2d 272 (D.N.J. 2000) (sovereign immunity applied to Rowan College at summary judgment stage).
>
> . . . Questions of Eleventh Amendment immunity are for the court to decide. *Bostanci, supra,* 2010 WL 4961621 at *1, 2010 U.S. Dist. LEXIS 126693 at *2–3 (citing *Skehan v. State System of Higher Education,* 815 F.2d 244, 246 (3d Cir. 1987)). The burden of setting forth facts proving entitlement to immunity is borne by the party asserting such immunity, *Id.* at *1, 2010 U.S. Dist. LEXIS 126693 at *3 (citing *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir. 1995)).

*Id* at 430-431. Based on the information WPU provided in its motion to dismiss in *Brennan*, I held that "WPU ha[d] not remotely met its burden of setting forth sufficient facts to demonstrate an entitlement to [Eleventh Amendment] sovereign immunity." *Id.* at 432.

The limited information that I may consider on this motion to dismiss, which is directed to the face of the complaint, does not justify a different result as to State sovereign immunity. Unlike the Eleventh Amendment, a

jurisdictional bar which permits the court to consider extrinsic evidence under Rule 12(b)(1), state-law sovereign immunity "is an affirmative defense . . . ." *Garcia v. Richard Stockton Coll. of New Jersey*, 210 F. Supp. 2d 545, 548 (D.N.J. 2002) (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 347 (3d Cir. 1999) (citing *Christy v. Pennsylvania Turnpike Commission*, 54 F.3d 1140, 1144 (3d Cir.1995)).

Under the Third Circuit's "three-part test," a court must examine "the following three elements: (1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Id.* at 431 (citing *Bowers*, 475 F.3d at 546; *see also Fitchik*, 873 F.2d 655). As I explained in *Brennan*:

> The first "question at issue is 'whether a money judgment against a state instrumentality or official would be enforceable against the State.'" *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). The appropriate underlying inquiry "is whether the State is obligated to pay or reimburse the University for its debts." *Bowers,* 475 F.3d at 547. In *Bostanci,* for example, this Court found that New Jersey City University "failed to show that the State of New Jersey bears an obligation to pay a judgment against it[,]" noting that, under state statutes pertaining to state universities generally, a university's board of trustees may borrow money from the state, but such borrowing would not constitute a debt of the State. *See Bostanci* at *2, 2010 U.S. Dist. LEXIS 126693 at *5 (citing N.J.S.A. § 18A:64–6(t)).

*Brennan,* 34 F. Supp. 3d. at 431.[6]

Here, Defendants do not even really attempt to address the first factor. They merely note that "there is no clear answer as to the . . . *Fitchik* factor

---

[6]      "None of the three *Fitchik* factors is itself dispositive. The Third Circuit formerly stated that the question of whether any judgment would be paid out of the state treasury is the 'most important' factor." *State of N.J., Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc.*, 923 F. Supp. 651, 655 (D.N.J. 1995) (citations omitted) (quoting *Fitchik*, 873 F.2d at 659). More recently, however, that Court has stated that "we [] no longer ascribe primacy to the first factor." *Benn v. First Judicial Dist. of Pa.,* 426 F.3d 233, 239 (3d Cir. 2005). Instead, the financial liability factor is just "one factor co-equal with [the] others in the immunity analysis." *Id.* at 240.

about the funding source of judgment." (Def. Mot. at 63). At this, the motion to dismiss stage, there is nothing else for me to consider as to factor one.

"The second question asks whether the State itself considers the entity an arm of the state. Under the second factor, we look to how state law treats the entity generally; whether the entity can sue or be sued in its own right, whether the entity is separately incorporated, and whether the entity is immune from state taxation." *Brennan*, 34 F. Supp. 3d at 431 (citing *Bowers*, 475 F.3d at 548).

Here, Defendants note that WPU was statutorily established as a "state college" under N.J. Stat. Ann. § 18A:64-1 *et seq.* As such, it is not separately incorporated or empowered to "sue and be sued"; it has the power of eminent domain; and it is within the definition of the "State" for the purposes of the New Jersey Tort Claims Act and the New Jersey Contractual Liability Act. (Def. Mot. at 63-64) (citing the relevant New Jersey statutes) Further, as a state college, WPU is subject to the New Jersey Administrative Procedure Act in resolving certain controversies and disputes; its collective bargaining with unions is governed by the New Jersey Employer-Employee Relations Act; and certain employees are protected by the Civil Service Laws and state personnel regulations. (Def. Mot. at 63-64) (same) That is much more than WPU presented in support of the second *Fitchik* factor in *Brennan.* Nevertheless, most, if not all, of these characteristics were also before the court in *State of NJ DEP v. Gloucester*, 923 F. Supp. 651, 657-59 (D.N.J. 1995) (Simandle, J.), in which Glassboro State College was named as a defendant. *Gloucester* found no "clear answer as to the [state] colleges' status under state law. Some [factors] support a finding of immunity, others do not." *Id.* at 658. *Gloucester* concluded that "this second *Fitchik* factor, *i.e.,* the entity's status under state law, tilts slightly in favor of finding immunity of the state colleges, but only to a small degree." *Id.* at 659 (quotations omitted).[7]

---

[7]     *Gloucester* cited general legislative findings that the State colleges are independent of State government:

The third factor concerns the extent of the institution's autonomy. Defendants offer little on this point. WPU argues that a 2011 State Reorganization Plan consolidated and transferred "powers, functions, and duties," previously belonging to the New Jersey Commission on Higher Education, to the Secretary of Higher Education (the "Secretary"). (Def. Mot. at 64-65) (quoting 43 N.J.R. 1625(a)) "As a result, the Secretary . . . now wields enforcement power . . . and the power to grant or revoke the licenses of State colleges. *Id.* (citing N.J. Stat. Ann. §§ 18A:3B-34, 18A:68-6, -7). Defendants fail to explain specifically how this reorganization has had any impact on the autonomy of state colleges like WPU.

WPU's contentions are suggestive, and the issue might profitably be revisited at the summary judgment stage. I cannot make the necessary findings without a factual record, however, and the issue is not clear enough as a matter of law to justify dismissal on a Rule 12(b)(6) basis. Accordingly, Defendants' motion to dismiss all counts against WPU on sovereign immunity grounds is denied.

---

The Legislature hereby finds that it is in the best interest of the State that the State colleges shall be and continue to be given a high degree of self-government and that the government and conduct of the colleges shall be free of partisanship. The Legislature finds further that a decentralization of authority and decision-making to the boards of trustees and administrators of the State colleges will enhance the idea of self-government. Such colleges shall be maintained for the purpose of providing higher education in the liberal arts and sciences and various professional areas, including the science of education and the art of teaching, at such places as may be provided by law. The names of the colleges shall be designated by the board of trustees subject to regulations of the Commission on Higher Education concerning university status. The name of each of the existing State colleges shall continue the same unless a new name is so designated.

N.J. Stat. Ann. § 18A:64-1. Such general declarations of principles, however, might or might not be overridden by other evidence not properly considered on a motion to dismiss.

16

### B. Counts Alleging Racial and Gender Discrimination

The Complaint, although it adequately alleges violations of the plaintiffs' due process and civil rights, including gender discrimination, fails to support with facts its allegations of racial discrimination. Counts 1, 3, 4, and 8 will therefore be dismissed to the extent they rest on a racial discrimination theory.

### 1. Title IX Claim (Count One)

In Count One, Plaintiffs allege that they were subjected to gender-based discrimination in violation of Title IX of the Education Amendments of 1972. Title IX provides in relevant part, "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or *be subjected to discrimination* under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphases added). "This provision, which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714-15 (2d Cir. 1994)). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.*

Plaintiffs contend in their briefing that they have adequately alleged three theories of Title IX claims against Defendants: "erroneous outcome," "selective enforcement," and "deliberate indifference" claims. (Pl. Opp. at 11) Differences between these different theories aside, Plaintiffs concede that in any case they must adequately allege that "the complained-of conduct was discriminatory." (Pl. Opp. at 8) (citing *Yusuf*, 35 F.3d at 715; *see also Mallory v. Ohio Univ.*, 76 F. App'x 634, 638, (6th Cir. 2003) ("In *Yusuf*, the Second Circuit, analogizing from Title VII law, categorized Title IX claims against universities arising from disciplinary hearings into 'erroneous outcome' claims and 'selective

17

enforcement' claims, both of which require a plaintiff to demonstrate that the conduct of the university in question was motivated by a sexual bias.")).

Defendants argue that Plaintiffs fail to plead specific facts that would support a plausible inference of a gender-based discriminatory motive on Defendants' part. Plaintiffs counter that in asserting a Title IX claim the Complaint need only "plead[] specific facts that support a *minimal* plausible inference of such discrimination" to survive a 12(b)(6) motion to dismiss. *See Doe v. Columbia Univ.*, 831 F.3d at 56 (emphasis added). In *Doe v. Columbia Univ.*, the Second Circuit explicitly applied the *McDonnell Douglas* burden-shifting framework[8] to Title IX claims and correspondingly reduced the plaintiff's initial pleading burden to reflect the temporary presumption that benefits a plaintiff who has established a prima facie case of discrimination. *Id* at 54-56 (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015) ("To the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal*.") (emphases in original)).

The Third Circuit has yet to directly address the application of *McDonnell Douglas* to the pleading burden for Title IX claims in the context of a motion to

---

[8]   The [*McDonnell Douglas*] framework consists of three steps. First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination. Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. If the defendant satisfies this burden, the reviewing court proceeds to the third step. At this stage, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not the true reason for the employment decision, but was merely a pretext for discrimination. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008) (citations and quotations omitted). *See also Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001).

dismiss. Under general pleading standards, however, it is clear at least that "[w]holly conclusory allegations" are insufficient. *Tafuto v. New Jersey Inst. of Tech.*, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011) (citing *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994)).

The issue is one that should be addressed, in a proper case, by the Third Circuit. I find, however, that it does not matter here. Whether under the off-the-rack *Iqbal* standard or a tailored *McDonnell Douglas* standard, I would find that gender-based discrimination in Defendants' treatment of Collick and Williams is adequately pled (and that race-based discrimination is not, *see infra*).

True, the allegations of gender-based discrimination are rife with conclusory assertions. In many places, the Complaint asserts that Defendants mistreated Collick and Williams, and merely appends the allegation that they did so "on the basis of their gender."[9] In other places, the Complaint alleges that Defendants had engaged in "a pattern of decision-making that discriminates against male students accused of sexual misconduct," Compl. ¶134, but without supporting facts.[10] I would not require a plaintiff to plead a

---

[9]     *See* Compl. ¶ 19 ("In arresting, disciplining, and jailing plaintiffs Collick and Williams, defendants discriminated against them on the basis of their gender and race and without affording them due process and the equal protection of the laws."); *Id.* ¶ 137 ("Male respondents in sexual misconduct cases at William Paterson are discriminated against solely on the basis of sex, and are subject to discipline without the benefit of due process."); *Id.* ¶ 159. ("[S]aid conspiracy . . . arose out of a class-based, invidiously discriminatory animus based on plaintiffs' gender and/or race."); *Id.* ¶ 163 ("[Certain defendants] had knowledge of the conspiracy to deprive plaintiffs [of their rights] based on their status as African American male students accused of sexual misconduct, and the overt acts/actions committed in furtherance thereof."); *Id.* ¶ 220 ("[Defendants] unlawfully discriminated against plaintiffs on the basis of their race and gender."); *Id.* ¶ 223 ("Plaintiffs Collick and Williams were presumed guilty and were not afforded the full protection of the law or their due process rights because they were male.").

[10]     *See Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 377 (E.D. Pa. 2015) (citing *Anh Truong v. Dart Container Corp.*, No. Civ.A.09–3398, 2010 WL 4237944, at *3 (E.D. Pa. Oct. 26, 2010) (dismissing Title VII claim for race or national origin discrimination where plaintiffs "baldly assert[ed]" that "Defendant has a pattern and

laundry list of incidents or a roster of comparators, but the Complaint must do more than just state the conclusion that discrimination is going on, or that female students who are similarly situated (in some unspecified way) are treated differently (in some unspecified way).

Also unpersuasive is Plaintiffs' quotation of a statement issued by President Waldron on November 30, 2014, which begins, "On November 25, 2014, a sexual assault of a female student allegedly took place in a residential hall on our campus. Five male students who were living in the residence halls have been arrested and charged." (Compl. ¶ 86) Plaintiffs make much of President Waldron's description of the alleged victim as female, and the perpetrators as male. (Pl. Opp. at 14) That minimal specification of gender, however, is natural in a report of sexual assault. I do not say that it is irrelevant, but without more it would not suffice to establish a plausible inference of gender bias.

The Complaint is likewise extremely unclear as to the manner in which "[WPU] and the University Police's policies, both as written and as enforced

---

practice of disparate treatment and discrimination against nonwhite employees (because of their race, color, ethnicity, and/or nationality).")

In one older case, the Second Circuit relied in part on the plaintiff's assertion that "males accused of sexual harassment at Vassar [College] are 'historically and systematically' and 'invariably found guilty, regardless of the evidence, or lack thereof,'" to find that the allegations of that complaint "easily [met] the requirements of Title IX." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 716 (2d Cir. 1994). However, *Yusuf* was decided prior to the introduction of the plausibility pleading standard articulated in *Twombly* and *Iqbal.*

Finally, Plaintiffs also cite *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016) (on a motion to dismiss), where the court held that the plaintiff's complaint had "plausibly establishe[d] a causal connection between gender bias and the outcome of his disciplinary proceeding." *Id.* at *17. The court based its holding on a consideration of the totality of the circumstances, which included the allegation that "male respondents in sexual assault cases are invariably found guilty at Cornell." *Id.* However, there, unlike here, there were additional specific factual allegations for the court to consider—in particular, that the female accuser ("Jane Doe") was treated more favorably than the male accused when both requested similar procedural treatment. *Id.* at *16 n.28 ("Doe was given additional time to submit her appeal despite that Plaintiff's earlier request for additional time during his final examination period was denied, and Doe was allowed to review Plaintiff's appeal whereas he was not allowed to review or comment on Doe's appeal.").

against plaintiffs, impose an unequal burden on male students accused of sexual misconduct." *Id.* ¶ 136; *see also id.* ¶ 133. Without evidentiary development, the Court cannot find the policies to be discriminatory.[11]

The Complaint gets a bit closer to sufficiency, however, in alleging that "[a]s a purported female victim, the Accuser's allegations against the male plaintiffs were accepted as true without any investigation being performed and without the development of any facts or exculpatory evidence." (Compl. ¶ 222) And the Complaint does allege that Collick and Williams were not given the opportunity to respond or explain themselves, did not receive proper notice of the specific charges, were not permitted to confront or cross-examine their accuser, were not given a list of witnesses against them, and more generally were not afforded a thorough and impartial investigation. (*E.g.*, Compl. ¶ 150)

Whether such allegations are true (or can survive summary judgment) remains an open question. At the pleading stage, however, an allegation that the process was one-sided, irregular, and unsupported by evidence may give rise to an inference of bias.[12]

---

[11]    The portions of the WPU Sexual Violence Policy and the Student Code of Conduct that Plaintiffs quote in the Complaint are at least facially gender-neutral. (Compl. ¶37-46) For example, the Sexual Violence Policy states that WPU "is dedicated to providing a campus environment free from violence for *all* members of the campus community. Domestic/dating violence, stalking and/or sexual violence incidents . . . happen to people of *all genders*, races, ethnicities, religions, ages, abilities, sexual orientations, gender expressions, sexual identities etc." (Compl. ¶ 37) (emphases added)

[12]    Allegations that a university was under government pressure may add plausibility to an otherwise-conclusory allegation of bias:

> [C]ourts have split on whether allegations along these lines—that due to pressure from the [U.S. Department of Education's Office for Civil Rights], men accused of sexual assault are invariably found guilty—pass muster after *Iqbal* and *Twombly*. Put another way, absent any female comparators at the pleading stage, is the allegation that schools are concerned about appearing too lenient on male students accused of sexual assault, and therefore those students are systematically found guilty regardless of the evidence, a factual allegation—which must be credited—or a conclusory legal allegation—which does not get the presumption of truth.

Plaintiffs state in their briefs that universities were under pressure to make a show of compliance with Title IX following a U.S. Department of Education's Office of Civil Rights ("OCR") "Dear Colleague Letter" in 2011. (Pl. Opp. at 14-15) A Complaint, of course, cannot be amended by statements in briefs. *See Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir.1988)). Nevertheless, this is an official, publicly promulgated document of which the Court may take judicial notice—not for the truth of anything stated therein, but for the fact of its promulgation.[13] And it is no more than a commonsense inference that the public's and the policymakers' attention to the issue of campus sexual assault may have caused a university to believe it was in the spotlight.

For the foregoing reasons, Count One, though far from ideally pled, sufficiently states a claim under Title IX. Accordingly, the motion to dismiss Count One is denied.

---

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 186 (D.R.I. 2016). Other cases relied on by Plaintiffs likewise upheld complaints where they contained corroborative factual allegations that the University had reason to slant its procedures. *See Doe v. Columbia Univ.*, 831 F.3d 46, 57–58 (2d Cir. 2016) (plaintiff alleged that the university was motivated "to accept the female's accusation of sexual assault and reject the male's claim of consent," to publicly demonstrate its seriousness "about protecting female students from sexual assault by male students" in order to counteract severe criticism by students and the press that it had previously tolerated sexual assault of female students); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014) ("[Plaintiff's] allegations show Defendants were reacting against him, as a male, to demonstrate to the [Office of Civil Rights] that Defendants would take action, as they had failed to in the past, against males accused of sexual assault.").

Of course, it would be better to simply include such allegations in the Complaint, rather than simply attach an allegation of bias to each complaint of unfairness. But I am considering whether the Complaint is adequate, not whether it is optimal.

[13]   It is available at www.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf, and has been cited and relied upon in other cases, *e.g.*, *Doe v. Brown Univ.*, 166 F. Supp. 3d at 181.

### 2. Section 1985 and 1986, NJLAD (Counts Three, Four, and Eight)

In Counts Three and Four, Plaintiffs allege that several of Defendants entered into a conspiracy to deprive Collick and Williams of their rights, in violation of 42 U.S.C. § 1985(3), or that they knew of that conspiracy but did nothing to stop it, in violation of 42 U.S.C. § 1986. "[I]n order to state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold*, 112 F.3d 682, 685, (3d Cir. 1997). "In order to maintain a cause of action under § 1986, the plaintiffs must show the existence of a § 1985 conspiracy" *Clark v. Clabaugh*, 20 F.3d 1290, 1295 n.5 (3d Cir. 1994).

In Count Eight, Plaintiffs allege that Defendants discriminated against Collick and Williams on the basis of their race and gender in violation of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.* ("NJLAD"). Under the NJLAD it is unlawful:

> For any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof . . . on account of the race . . . [or] sex, of such person."

N.J.S.A. § 10:5-12(f)(1); *see also* N.J.S.A. § 10:5-4 ("All persons shall have the opportunity . . . to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of race . . . [or] sex . . ."). A "place of public accommodation" includes "any . . . college and university, or any educational institution under the

supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." N.J.S.A. § 10:5-5(*l*).[14]

All three of these theories, then, require a plausible allegation of discrimination. For the reasons stated in the preceding section, I find that the Complaint, including these Counts, states a claim of gender discrimination.

As to racial discrimination, however, Counts 3, 4, and 8 fail to state a plausible claim. The Complaint alleges that "[a]ll of the alleged perpetrators, including [] Collick and Williams were African American males," while the student who accused them of sexual assault "is of Latina or Spanish origin," and that all of the investigating and arresting officers were either "Caucasian or Latino." (Compl. ¶¶ 225-27). Voicing a grievance and identifying the participants by race is not enough, standing alone, to support an inference of racial discrimination. And, in contrast to the gender discrimination theory, the racial discrimination theory is not accompanied by any corroborating allegations, however indefinite, that would support an inference of racial bias.

Accordingly, the motion to dismiss Counts Three, Four, and Eight is granted as to the theory of racial discrimination, but denied as to the theory of gender discrimination.[15]

### C. Federal and State Civil Rights Claims Relating to the Criminal and WPU Disciplinary Processes

#### 1. Section 1983 and the New Jersey Civil Rights Act (Counts Two and Six)

In Count Two, Plaintiffs assert Section 1983 claims alleging that President Waldron, Director Fulleman, Dt. Sgt. DeSimone, and other WPU and

---

[14]    Discrimination claims brought under the NJLAD are parallel to those under Title VII, and are analyzed within the *McDonnell Douglas* burden-shifting framework. *See Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim.")).

[15]    One of the sub-theories of Plaintiffs' claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act is equal protection. That, too, is dismissed as to racial discrimination but sustained as to gender discrimination. *See* Section III.C.1.d, *infra.*

Police employees violated Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

> Section 1983 provides that:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Thus, to sufficiently set forth a Section 1983 claim, a complaint must allege the violation of a right secured by the Constitution or laws of the United States, and that the alleged violation was committed by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L.Ed.2d 40 (1988).

In Count Six, Plaintiffs allege similar claims under the New Jersey Civil Rights Act (the "NJCRA"), N.J.S.A. § 10:6-1 *et seq*. The NJCRA "was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitutions." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). As both Plaintiffs and Defendants acknowledge, "This district has repeatedly interpreted NJCRA analogously to § 1983." *Id*. (*see also* Def. Mot. at 38-39; Pl. Opp. at 28 n.7) I will also "analyze Plaintiffs' NJCRA claims through the lens of § 1983." *Id*. at 444 (citing *Hedges v. Musco*, 204 F.3d 109, 121 n.12 (3d Cir. 2000) (concluding that New Jersey's constitutional provision concerning unreasonable searches and seizures is interpreted analogously to the Fourth Amendment)). Therefore, I address Counts Two and Six together. *See Middleton v. City of Ocean City*, No. CIV. 12-0605 RBK/JS, 2014 WL 2931046, at *5 (D.N.J. June 30, 2014) ("As the allegations under the separate constitutions are virtually identical, and federal and New Jersey law governing these violations are substantially similar, the Court will address them together.")

25

Defendants argue that each of these asserted constitutional violations is either legally or factually deficient. I address each of the theories underlying Counts 2 and 6: Fourth Amendment, procedural due process, substantive due process, and equal protection.

### a. Fourth Amendment

"The Fourth Amendment prohibits arrests without probable cause." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) (citing *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)). Thus, "[t]o state a claim for false arrest or improper seizure under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *Brown v. Mount Laurel Twp.*, No. CV 13-6455, 2016 WL 5334657, at *6 (D.N.J. Sept. 21, 2016) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).

Defendants first argue that Plaintiffs fail to state a claim for false arrest and false imprisonment in violation of the Fourth Amendment because the University Police had probable cause to arrest Collick and Williams. Defendants further argue that even if the University Police officers lacked probable cause, their conduct is protected by qualified immunity. At this motion to dismiss stage, I must reject both contentions.

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)). "A common sense approach must be taken to the issue of probable cause and a determination as to its existence must be based on the totality of the circumstances. *Paff v. Kaltenbach*, 204 F.3d 425, 436, 2000 WL 222582 (3d Cir. 2000) (citations and quotations omitted).

Generally, "the question of probable cause in a [S]ection 1983 damage suit is one for the jury." *Montgomery v. De Simone,* 159 F.3d 120, 124 (3d Cir. 1998); *see also Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 638 (D.N.J. 2011) (probable cause is "a sufficiently fact–laden issue as to typically be a question for the jury"). It is true that there are easy cases where a complaint establishes that the officers possessed a set of facts, and that set of facts establishes probable cause as a matter of law. *See, e.g., Baker v. Wittevrongel,* 363 F. App'x 146, 150 (3d Cir. 2010) (finding amendment of complaint futile where arrest was based on facts sufficient to establish probable cause). However, this is not such a case. I am not prepared to hold, as a matter of law, that there was probable cause to arrest Collick and Williams under the circumstances as pled in the Complaint.

According to the Complaint, three days after the accusing student reported the alleged sexual assault to the University Police, the police filed for and obtained warrants to arrest Collick without conducting any further investigation. (Compl. ¶ 6) The University Police allegedly "gave little thought, if any, to the investigation and discovery of the actual facts involved" (*Id.* ¶ 22), and failed to corroborate the accusations in any way. (*Id.* ¶¶ 6, 87-90) In particular, the police officers did not "perform or obtain a rape kit" to obtain physical evidence (*Id.* ¶ 90), "speak to potential witnesses" (*Id.* ¶ 87), or "obtain or review" the dormitory building security camera video (*Id.* ¶ 88). In addition, at no point did the police seek any exculpatory evidence (*Id.* ¶ 89), nor did they interview Collick or Williams, review any cell phone records, examine the accuser's social media and blogging activity, or investigate any previous relationship between Collick and Williams and their accuser. (*Id.* ¶¶ 82-83) Accepting these allegations as true, I cannot as a matter of law rule out a conclusion that the University Police lacked probable cause to arrest and detain William and Collick. Therefore, Defendants have not met their burden to show that Plaintiffs failed to state a claim for Section 1983 false arrest and imprisonment.

27

Defendants assert that the University Police officers, even if they are in the wrong, are nevertheless entitled to qualified immunity. "[Q]ualified immunity shields government officials from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Schneyder v. Smith*, 653 F.3d 313, 331 (3d Cir. 2011) (internal citations and quotations omitted).

Qualified immunity issues (such as whether a violation was "objectively apparent" under the circumstances at the time) may require the kind of factual context that is available only on summary judgment or at trial. Nevertheless, when a qualified immunity issue is raised on a motion to dismiss, the Court is obligated to address it. "'[U]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985)). As *Thomas* implies, at the pleading stage such a clear violation need only be alleged, not proven. "The focus of the qualified immunity inquiry is on the allegations . . . ." *Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014).

The Complaint alleges that the University Police arrested Collick and Williams without probable cause, failed to take basic investigatory steps that reasonable officers would at least have attempted, jumped to the conclusion of probable cause, and generally showed little interest in corroborating the veracity of Doe's report of sexual assault. If that were all true, it could constitute a violation of clearly established law that would have been apparent to a reasonable officer. *See, e.g., Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (as of 1989, "the right to be free from arrest except on

probable cause was clearly established"). Thus I cannot hold, without a factual record, that Defendants' behavior was reasonable. The motion to dismiss on grounds of qualified immunity will therefore be denied at this, the pleading stage. This denial is without prejudice to reconsideration after appropriate discovery has been conducted.[16]

### b. Procedural Due Process

"In the context of public education, the due process clause may be implicated if a student is suspended or expelled without notice or an opportunity to be heard." *Bowers v. NCAA*, 475 F.3d 524, 555 n.33 (3d Cir. 2007) (citing *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). Additionally, "the law on procedural due process . . . require[s] that the decision of student disciplinary proceedings be supported by 'substantial evidence.'" *Le v. Univ. of Med. & Dentistry*, No. CIV.A. 08-991SRC, 2009 WL 1209233, at *13 (D.N.J. May 4, 2009) (citing *Sill v. Pennsylvania State Univ.*, 318 F. Supp. 608, 621 (M.D. Pa. 1970)). "The substantial evidence standard is extremely deferential to the factfinder: 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might

---

[16]    Defendants note that the University Police obtained warrants to arrest Collick and Williams. (Def. Mot. at 19) (citing Compl. ¶¶ 6, 81) Courts have generally extended qualified immunity "to an officer who makes an arrest based on an objectively reasonable belief that there is a valid warrant." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000). "Nevertheless, an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances." *Id.* The Third Circuit has explained that "a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for the warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Goodwin v. Conway*, No. 15-2720, 2016 WL 4728004, at *4 (3d Cir. Sept. 12, 2016) (citing *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000)). Officers are obligated to disclose known facts that "[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know" in making a probable cause determination. *Wilson*, 212 F.3d at 787. Like the determination of whether there was probable cause, this issue requires further factual development in discovery, and will be resolved on summary judgment or at trial.

accept as adequate to support a conclusion.'" *Metropolitan Stevedore Co. v. Rambo,* 521 U.S. 121, 149, 117 S. Ct. 1953 (1997) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S. Ct. 206 (1938)).

The Complaint sets forth violations of procedural due process standards. Among other things, it alleges that WPU's decisions to discipline Collick and Williams were not supported by substantial evidence. (Compl. ¶¶ 111, 150-52; *see also* Pl. Opp. at 26) I agree with Defendants that the Complaint could have been far more specific about the disciplinary proceedings, but that is not the standard. Read in the light most favorable to the Plaintiffs, the allegations that Defendants lacked credible evidence and did not comply with their own regulations (*e.g.*, Compl. ¶¶ 83-84, 87, 110), adequately make out a claim that WPU's disciplinary actions did not comply with due process standards.

That is sufficient to require the Court to deny the motion to dismiss the procedural due process component of Counts 2 and 6.

### c. Substantive Due Process

In *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 142 (3d Cir.2000), the Third Circuit summarized the framework for approaching a plaintiff's challenge to "non-legislative state action (such as an adverse employment decision)" on substantive due process grounds. The Third Circuit explained that:

> [W]e must look, as a threshold matter, to whether the property interest being deprived is "fundamental" under the Constitution. If it is, then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used. If the interest is not "fundamental," however, the governmental action is entirely outside the ambit of substantive process and will be upheld so long as the state satisfies the requirements of procedural due process.

*Id.*; *see also Chainey v. Street,* 523 F.3d at 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.,* 316 F.3d 392, 400-02 (3d Cir. 2003)) ("To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due

30

process clause and the government's deprivation of that protected interest shocks the conscience.").

Plaintiffs allege that Defendants' conduct interfered with Plaintiffs' reputational interests and their "property interest in their education." (Compl. ¶ 152) Defendants argue that Plaintiffs fail to state a claim for a substantive due process violation because the interests at issue are not fundamental rights or liberty interests, and Defendants' actions were rationally related to a legitimate state interest. (Def. Mot. at 27-28; Def. Reply at 7-8) I agree.

"[T]here is no fundamental right to education protected under the federal constitution." *MG. v. Crisfield*, 547 F. Supp. 2d 399, 408 (D.N.J. 2008) (citing *Bowers v. NCAA*, 475 F.3d 524, 553 (3d Cir. 2007) ("[T]he Supreme Court has held that there is no fundamental right to public education")).[17] In *Mauriello v. University of Medicine & Dentistry of New Jersey*, 781 F.2d 46 (3d Cir. 1986), the Third Circuit opined that "a graduate student's interest in continued academic enrollment 'bore little resemblance to the fundamental interests that previously had been viewed as implicitly protected by the Constitution.'" *Nicholas*, 227 F.3d at 141-42 (quoting *Mauriello*, 781 F.2d at 50). Additionally, "reputation alone is not an interest protected by the Due Process Clause," let alone a fundamental right. *Kelly v. Borough of Sayreville, N.J.*, 107 F.3d 1073, 1077 (3d Cir. 1997) (citing *Clark v. Twp. of Falls*, 890 F.2d 611, 619 (3d Cir. 1989)); *see also Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155 (1976).

"Government actions that do not affect fundamental rights or liberty interests and do not involve suspect classifications will be upheld if [ ] they are rationally related to a legitimate state interest." *MG. v. Crisfield*, 547 F. Supp. 2d 399, 408 (D.N.J. 2008). Because Plaintiffs' asserted educational and

---

[17]     *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 91-92 (1978) and *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 222 (1985), cited by Plaintiffs (Pl. Opp. at 20-21), are not to the contrary. In both cases, the Supreme Court only assumed, without deciding, the existence of a liberty or property interest in an education, but then dismissed the substantive due process claim on the ground that the students' dismissals were not arbitrary.

reputational interests are not fundamental rights or liberty interests, a rational-basis standard applies. The Complaint does not plausibly allege that the investigation and disciplinary process for students accused of sexual assault is not rationally related to the legitimate state interest of ensuring public safety. *See Schall v. Martin*, 467 U.S. 253, 264, 104 S. Ct. 2403, 2410 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (quotations omitted).

That is not to say that those interests are not protected by other constitutional principles, such as procedural due process or the Fourth Amendment—but that is a separate issue. Plaintiffs' allegations related to the the criminal and disciplinary *process* have been considered, and largely sustained, above. And to the extent that the substantive due process interest claimed is the right to be free of discrimination, the claim is superfluous.

The motion to dismiss the substantive due process component of Counts 2 and 6 is therefore granted.

### d. Equal Protection

Defendants argue that Counts 2 and 6 do not sufficiently plead a claim of race or gender-based discrimination under the Fourteenth Amendment's Equal Protection Clause. (Def. Mot. at 28) To state a claim under the Equal Protection Clause, a plaintiff must allege that (1) he is a member of a protected class; (2) that he was treated differently from similarly situated individuals; and (3) that this disparate treatment was based on his membership in the protected class. *See Kasper v. Cnty. of Bucks,* 514 F. App'x 210, 214 (3d Cir. 2013) (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir. 1990)).

For the reasons expressed above, gender discrimination is sufficiently rooted in the factual allegations of the Complaint (*see* Section III.B.1), although racial discrimination is not (*see* Section III.B.2). The motion to dismiss the equal protection component of Counts 2 and 6 is therefore granted as to racial discrimination, but denied as to gender discrimination.

### D. Responsibility of WPU, University Police, and Supervisors

In this section, I discuss the allegations that WPU, the University Police, and supervisory personnel are responsible for any federal or state civil rights violations (*see* Sections III.B and C, *supra*) perpetrated by employees.[18] Also discussed is Count 21, which seeks declaratory relief against WPU.

### 1. *Monell*/Counts 5 and 7

In Counts Five and Seven, Plaintiffs allege that WPU and the University Police are responsible for any federal and state civil rights violations perpetrated by their employees, including President Waldron, Director Fulleman, and Det. Sgt. DeSimone. (Compl. ¶¶ 178, 182, 209, 213)

It is well established that the liability of a government body (typically a municipality) under Section 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As a consequence, a municipality may be liable under Section 1983 only where the constitutional injury is alleged to have been caused by a municipal "policy" or "custom". *See Monell,* 436 U.S. at 694, 98 S. Ct. 2018. A municipal policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir. 1990) (internal quotations omitted). In a proper case, "an official with policymaking authority can create official policy, even by rendering a single decision." *McGreevy v. Stroup,* 413 F.3d 359, 367–68 (3d Cir. 2005) (considering whether a school superintendent was a final policymaker with regard to allegedly retaliatory issuance of substandard employment rating for school nurse); *see also Ecotone Farm LLC v.*

---

[18]    Vicarious *respondeat superior* liability as to certain state claims is discussed separately in Section III.E.9, *infra.*

*Ward*, 639 F. App'x 118, 127 (3d Cir. 2016) (town engineer's decision to enforce a soil disturbance ordinance was attributed to the township because he was the final policymaker in that domain).

Plaintiffs allege that President Waldron, Director Fulleman, and Det. Sgt. DeSimone were the holders of "high level" positions within WPU and the University Police. As such, (1) "President Waldron was the person responsible for all aspects of student life" at WPU; 2) Director Fulleman "was responsible for implementing, overseeing, and supervising all laws and safety procedures" at WPU; and 3) "Sergeant DeSimone was a sergeant with the University Police." (Compl. ¶¶ 30-32) As a result, their "decisions, statements, instructions, and/or edicts" allegedly constitute University policy or custom. (Compl. ¶¶ 168-73, 199-204.)

These paragraphs plausibly allege that certain Defendants were in positions of final policy-making authority with respect to the criminal investigation and student disciplinary process, and that their actions should be deemed to bind WPU and the University Police. The motion of WPU and the University Police to dismiss Counts Five and Seven is therefore denied.

## 2. Negligent Training and Supervision (Count Fifteen)

In Count Fifteen, Plaintiffs assert a claim against WPU, the University Police, President Waldron, and Director Fulleman for failing to properly train and supervise WPU employees to properly investigate and respond to allegations of sexual misconduct. (Compl. ¶¶ 270-75) This allegedly renders them liable as employers and supervisors for the alleged violations of federal and state civil rights perpetrated by lower level employees.

"To state a claim for negligent supervision, a plaintiff must show that 1) the defendant employer knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of its employee; 2) the defendant could reasonably have foreseen that such qualities created a risk of harm to other persons; and 3) the defendant's negligence proximately caused the plaintiff's injuries." *Carmichael v. Carmichael*, No. 13-CV-2409 DMC JBC,

34

2014 WL 347804, at *4 (D.N.J. Jan. 31, 2014) (citing *Smith v. Harrah's Casino Resort of Atl. City,* No. A–0855–12T2, 2013 WL 6508406, at *3 (N.J. Super. Ct. App. Div. Dec. 13, 2013)) (internal quotations omitted). "In order to establish a prima facie case for negligent training, Plaintiff must plead facts sufficient to sustain a claim of negligence. In this case, those elements would be that (1) Defendant owed a duty to Plaintiff to properly train its employees; (2) Defendant breached that duty; (3) Defendant's breach of its duty to train its employees properly proximately caused Plaintiff's injury; and (4) Defendant's breach caused actual damages to Plaintiff." *Sullivan v. Marina Dist. Dev. Co., LLC,* No. CIV. 10-4204 RBK/JS, 2012 WL 993417, at *4 (D.N.J. Mar. 23, 2012) (citing *Stroby v. Egg Harbor Twp.,* 754 F. Supp. 2d 716, 721 (D.N.J. 2010)).

Defendants move to dismiss this claim, arguing that Plaintiffs must prove that Defendants "acted with deliberate indifference to the known or obvious consequences of its acts or its failure to act," and that Plaintiffs fail to plead sufficient facts to state this claim. (Def. Mot. at 53) (citing *Adams v. City of Camden,* 461 F. Supp. 2d 263, 267, 2006 WL 3290277 (D.N.J. 2006)). In particular, Plaintiffs do not allege facts tending to show Defendants' awareness of "some prior unlawful conduct in sexual assault investigations," (*Id.* at 54) (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989).

In their reply brief, Defendants argue that "Plaintiffs cannot merely speculate about the quality of training or supervision for sexual assault investigations without alleging at least some facts in their Complaint demonstrating some prior conduct . . . that could give rise to the [defendants'] knowledge of insufficient training or supervision." (Def. Reply at 19; *see also* Def. Mot. at 54) The requirement, however, is more general: that a defendant "knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of its employee." *Carmichael,* 2014 WL 347804, at *4.[19] Of

---

[19]     Plaintiffs do allege that certain WPU and University Police employees, including Det. Sgt. DeSimone, were "were at no time trained on how to properly respond to allegations such as those made by the Accuser." (Compl. ¶ 272) At the very least, the

course, evidence of past incidents may be important and the lack of it might cause the claim to fail. But I will not require it at the pleading stage.

Accordingly, Defendants' motion to dismiss Count Fifteen is denied.

### 3. Declaratory Judgment (Count Twenty-One)

This is as good a place as any to address Count Twenty-One, which seems to be directed primarily to the University itself. This Count seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that:

> (1) the outcome and findings made by William Paterson be reversed; (2) plaintiffs' reputations be restored; (3) plaintiffs' disciplinary records be expunged; (4) the record of plaintiffs' expulsion from defendant William Paterson University be removed from their education files; and (5) William Paterson's rules, regulations, and guidelines are unconstitutional as applied.

(Compl. ¶ 105) It is true that declaratory relief is forward-looking, and that a "declaratory judgment is inappropriate to adjudicate past conduct or to proclaim that one party is liable to another." *Corliss v. O'Brien,* 200 F. App'x 80, 84 (3d Cir. 2006). Many of the allegations in Count 21 appear to run afoul of that principle. At this early stage, however, I will not dismiss this Count, which is primarily a demand for a particular form of relief in the event Plaintiffs should prevail. The fashioning of relief, should any be warranted, can await the event.

Accordingly, the motion to dismiss Count Twenty-One is denied.

### E. State Common Law Claims

### 1. False Arrest and Imprisonment (Count Nine)

In Count Nine, Plaintiffs assert a common law claim for false arrest and imprisonment against Director Fulleman and Det. Sgt. DeSimone and other unnamed members of the University Police. Probable cause is asserted as an absolute defense to false arrest and false imprisonment claims. *See Calloway v.*

---

Plaintiffs' factual allegations about the many allegedly gross failures in WPU's handling of the investigation and disciplinary process, taken as true at the motion to dismiss stage, allow a reasonable inference that the defendants were not properly trained.

*Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 561 (D.N.J. 2000) (citing *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 389, 744 A.2d 1146, 1154 (2000)). However, as discussed above in Count Two, the Complaint adequately alleges that Defendants lacked probable cause. Accordingly, the motion to dismiss Count Nine is denied.

### 2. Malicious Prosecution (Count Ten)

In Count Ten, Plaintiffs assert a tort claim for malicious prosecution. Such claim has "four elements: (1) a criminal action was instituted by this defendant against this plaintiff; (2) the action was motivated by malice; (3) there was an absence of probable cause to prosecute; and (4) the action was terminated favorably to the plaintiff." *Ross v. Bd. of Educ. Greater Egg Harbor Reg'l High Sch. Dist.*, No. CIV. 11-6490 NLH/KMW, 2015 WL 3613724, at *6 (D.N.J. June 8, 2015) (citing *LoBiondo v. Schwartz*, 970 A.2d 1007, 1022 (N.J. 2009)). "The essence of an action for malicious prosecution is that the proceeding was instituted without probable cause, that the complainant was actuated by a malicious motive in making the charge." *Earl v. Winne*, 14 N.J. 119, 134, 101 A.2d 535, 543 (1953).

As before, Defendants assert that they possessed probable cause. The allegations that they lacked probable cause, however, are adequate, for the reasons stated above.

Defendants argue in addition that the Complaint contains no facts suggesting legal malice. Under New Jersey law, however, "in an appropriate case, malice may be inferred from a lack of probable cause." *LoBiondo v. Schwartz*, 199 N.J. 62, 94, 970 A.2d 1007, 1025, 2009 WL 1362989 (2009) (discussing both malicious prosecution and malicious use of process); *see also Prince v. Aiellos*, 594 F. App'x 742, 746, 2014 WL 6765822 (3d Cir. 2014) (unpublished) (on appeal of summary judgment the Third Circuit held that "[h]aving concluded that the District Court did not err in holding that material facts are in dispute regarding probable cause, it follows that malice . . . remains an open question.").

The Complaint alleges that the defendants "initiated a criminal process against plaintiffs as a pretextual justification for the injuries inflicted upon plaintiffs Collick and Williams and/or in order to protect themselves from criminal and civil liability" and that they "initiated and/or caused the initiation of criminal process and charges . . . without legal or factual justification and were not based upon probable cause." (Compl. ¶¶ 243-45)[20] Defendants urge that these allegations have an "obvious [benign] alternative explanation." (Def. Mot. at 44) (citing *Iqbal*, 556 U.S. at 680-81) The Complaint, however, must be interpreted in the light most favorable to the Plaintiffs at this stage. The facts and circumstances alleged are sufficient support a plausible inference of legal malice.

Accordingly, Defendants' motion to dismiss Count Ten is for the most part denied. For the reasons expressed at Section III.D.9, however, *respondeat superior* liability of WPU and the University Police is barred by the State Tort Claims Act, and the motion is granted to that extent.

### 3. Malicious Abuse of Process (Count Eleven)

Count Eleven alleges malicious abuse of process in that Defendants used the investigation, interview, arrest, and imprisonment of Collick and Williams to accomplish an ulterior purpose. (Compl. ¶¶ 249-251) Under New Jersey Law, the elements of malicious abuse of process are: "(1) an ulterior motive and (2) some further act *after* an issuance of process representing the perversion of the legitimate use of the process." *SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1067 (D.N.J. 1989) (quoting *Fielder Agency v. Eldan Constr. Corp.*, 152 N.J. Super. 344, 348, 377 A.2d 1220 (Law Div.1977)) (emphasis

---

[20]     This twofold allegation puts off the necessity of deciding whether a bare finding of lack of probable cause would establish malice at summary judgment. *See Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 396, 972 A.2d 1112, 1120 (2009) ("That said, a plaintiff cannot simply point to the absence of probable cause as sufficient proof of the required element of malice. It has been well said that 'it is not unreasonable to require that plaintiff, on a defendant's motion for summary judgment, produce at least some extrinsic evidence of malice.'") (quoting *Westhoff v. Kerr S.S. Co.*, 219 N.J. Super. 316, 324, 530 A.2d 352 (App. Div.1987)).

added); *see also Unitronics, Inc. v. Robotic Parking Sys. Inc.*, No. CIV.A.09-3493, 2010 WL 2545169, at *6 (D.N.J. June 18, 2010) (citing *Simone v. Golden Nugget Hotel & Casino,* 844 F.2d 1031, 1036–1037 (3d Cir. 1988) (same)). "Thus, a plaintiff must allege a further act by which the defendant acted to use the process in an illegitimate way. 'In the absence of some coercive or illegitimate use of the judicial process there can be no claim for its abuse.'" *Unitronics, Inc.,* 2010 WL 2545169, at *6 (D.N.J. June 18, 2010) (citing *Penwag Property Co. v. Landau,* 148 N.J. Super. 493, 499, 372 A.2d 1162 (App. Div. 1977)).

Plaintiffs fail to allege any act after the initiation of the criminal case that constituted a perversion of the legitimate use of process. The Complaint does allege that the Defendants "used the issuance of process as a means to unlawfully and unjustifiably interrogate and arrest Collick and Williams" (Compl. ¶ 250); in their brief, they clarify that by "unlawfully and unjustifiably," they meant that these actions were "without reasonable basis or probable cause." (Pl. Opp. at 43) This renders the abuse of process claim redundant—*i.e.,* wholly duplicative of the malicious prosecution claim.

The separate identity of this tort is best maintained by rule that abuse of process is confined to subsequent misuse of legitimately issued process.. *See Earl v. Winne,* 14 N.J. 119, 128, 101 A.2d 535, 540 (1953) (quoting *Ash v. Cohn,* 119 N.J.L. 54, 58, 194 A. 174, 176 (E. & A. 1937)); *Baglini v. Lauletta,* 338 N.J. Super. 282, 293–94, 768 A.2d 825 (App. Div. 2001) (quoting Prosser & Keeton on Torts § 121 at 897 (5th ed. 1984)) ("The gist of the tort of malicious abuse of process . . . is the misuse, or 'misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance.'").[21]

---

[21]   Although a malicious abuse of process claim presupposes a legitimate process that is being abused, Plaintiffs do not concede that the arrest, custodial interview, and imprisonment were initiated legitimately; they allege that probable cause was lacking.

One possible ulterior purpose is contained in the allegation that Defendants obtained a warrant for the purpose of arresting and questioning suspects. That, however, is not ordinarily considered a perversion, but rather a standard feature, of the criminal process. The Complaint also alleges that Defendants "made misrepresentations to gain an advantage over plaintiffs Collick and Williams's certain constitutional claims and/or to protect their interests." (Compl. ¶ 251) The Complaint does not, however, further describe such misrepresentations. Nor does it explain what collateral advantage the Defendants sought, the ulterior interest the Defendants hoped to protect, or the manner in which it was protected through their alleged misrepresentations.

For the foregoing reasons, the Complaint fails to allege facts supporting a plausible inference of either an ulterior motive or an act representing the perversion of the legitimate use of the process. Accordingly, the motion to dismiss Count Eleven, alleging malicious abuse of process, is granted.

### 4. Tortious Interference with Prospective Economic Advantage (Count Twelve)

In Count Twelve, Plaintiffs assert a claim for tortious interference with prospective economic advantage arising from Defendants' statements about, and its investigation, prosecution, and discipline of, Collick and Williams. These acts, the Complaint alleges, deleteriously affected (1) Plaintiffs' relationships with WPU, and (2) Plaintiffs' relationships with the Educational Opportunity Fund Program (the "EOFP"). (*See* Compl. ¶¶254-58)

Under New Jersey law, the elements of tortious interference with prospective economic advantage are: "(1) a protected interest, not necessarily amounting to an enforceable contract; (2) defendant's intentional interference without justification; (3) a reasonable likelihood that the benefit plaintiff anticipated from the protected interest would have continued but for the interference; and (4) resulting damage." *Moe v. Seton Hall Univ.*, No. CIVA 2:09-

---

They are permitted, however, to plead theories in the alternative. *See* Fed. R. Civ. P. 8(d).

01424, 2010 WL 1609680, at *9 (D.N.J. Apr. 20, 2010) (quoting *Jenkins v. Region Nine Housing Corp.*, 306 N.J.Super. 258, 703 A.2d 664, 667 (N.J. Super. App. Div. 1997)). "Importantly, this claim must be made against a non-party to the interest creating relationship." *Id.* (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 563 A.2d 31, 37. (N.J. 1989)).

Count 12, to the extent it alleges interference with the relationship between Plaintiffs and WPU, is legally insufficient. This is a third-party tort; a party cannot "interfere" with its own relationship. Defendants, to the extent they acted in the scope of their employment, acted on behalf of WPU, a party to the interest-creating relationship. It may be true, as Plaintiffs say, that whether a person acts within the scope of employment is an issue of fact—but their argument presupposes a complaint that places that fact in issue. This Complaint alleges that the individual Defendants were employees, and contains no facts suggesting that they acted outside the scope of employment.

Plaintiffs also claim, however, that the Defendants interfered with their advantageous relationship with the EOFP. EOFP is a "program instituted to offer students from disadvantaged backgrounds the tools and financial support needed to succeed in college." At the time of their expulsion, Collick and Williams were beneficiaries of EOFP loans that enabled them to attend WPU. (Compl. ¶¶ 35, 50, 60) The Complaint adequately, if not quite clearly, alleges that they had a reasonable expectation of enjoying continued financial aid until Defendants' alleged misconduct "severed plaintiffs' relationship[]" with the EOFP (Compl. ¶¶ 254, 256, 117) That is enough to sustain the count on the EOFP theory only.

Accordingly, the motion to dismiss Count Twelve is granted as to Plaintiffs' relationship with WPU, but denied as to Plaintiffs' relationship with the EOFP.

### 5. Breach of Contract (Count Thirteen)

In Count Thirteen, Plaintiffs assert a claim for breach of contract against WPU, President Waldron, Director Fulleman, and other unknown defendants

41

acting on their behalf. (Compl. ¶ 265) Under pure contract principles, "Plaintiff must prove that a valid contract existed, Defendant materially breached the contract and Plaintiff suffered damages as a result of the breach." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 421 F. Supp. 2d 831, 833 (D.N.J. 2006) (citing *Coyle v. Englander's*, 199 N.J. Super. 212, 223, 488 A.2d 1083 (1985)). "In order for a valid contract to exist, Plaintiff must show mutual assent, consideration, legality of the object of the contract, capacity of the parties and form[ality] of memorialization." *Id.* (citing *Cohn v. Fisher*, 118 N.J. Super. 286, 291, 287 A.2d 222 (1972)). Defendants argue that Plaintiffs fail to plead either the existence of a valid contract or facts demonstrating that Defendants committed a breach. (Def. Mot. at 50)

"*[P]ublic* university students who are disciplined may bring a traditional due process claim, but they may also bring a contract claim." *Moe v. Seton Hall University*, No. CIVA 2:09-01424, 2010 WL 1609680, at *4 (D.N.J. Apr. 20, 2010) (emphasis in original). The relationship between a student and the university is not purely contractual, however, and a student's contract claim arising from a public university's disciplinary process is not adjudicated under strict contract principles. *Hernandez v. Don Bosco Preparatory High*, 322 N.J. Super. 1, 730 A.2d 365 (App. Div. 1999); *Mittra v. University of Medicine*, 316 N.J. Super. 83, 719 A.2d 693 (App. Div. 1998); *Napolitano v. Trustees of Princeton Univ.*, 186 N.J. Super. 548, 453 A.2d 263 (App. Div. 1982); *see also McMahon v. Salmond*, 573 F. App'x 128 (3d Cir. 2014); *Moe v. Seton Hall Univ.*, No. CIVA 2:09-01424, 2010 WL 1609680, at *4-6 (D.N.J. Apr. 20, 2010). Rather, when a student asserts a contract claim, the scope of judicial review of the disciplinary process is limited to "a determination whether the procedures followed were in accordance with the institution's rules and regulations." *Mittra*, 316 N.J. Super. at 90, 719 A.2d 693.[22]

---

[22]   I note, as did Judge Chesler in *Moe*, that *Mittra* and *Napolitano* involved disciplinary action for academic failure, unlike the alleged misconduct in *Moe* and in this case. Academic failure cases present public policy concerns not present in

A court in this district recently predicted how the New Jersey Supreme Court would treat a contract claim similar to that of Plaintiffs in the context of a *private* university, Seton Hall. *Moe v. Seton Hall Univ.*, 2010 WL 1609680, at *4-6 (D.N.J. Apr. 20, 2010) (Chesler, J.). *Moe* concluded that "a student in a private university contesting disciplinary proceedings, including expulsion, will not prevail if the university adhered to its own rules, the procedures followed were fundamentally fair, and the decision was based on 'sufficient' evidence." *Id.* at *4 (citing *Hernandez*, 730 A.2d at 375-76) (internal citations omitted). WPU is not a private university like Seton Hall, but public university students are entitled to at least as much protection.[23] *Moe* and *Hernandez,* then, set at least a procedural floor, below which public university procedures cannot go. Therefore, if Plaintiffs allege facts that plausibly suggest that the procedures did not satisfy the three *Moe/ Hernandez* factors, they will have adequately stated a claim for breach of contract.

Read in the light most favorable to Plaintiffs, the Complaint sufficiently alleges that Defendants did not adhere to WPU's own rules, that the procedure they followed was unfair, and that the decision was not based on sufficient evidence. WPU's rules that govern its investigations and disciplinary proceedings, as expressed in both its Sexual Violence Policy and the Student Code of Conduct, state that the standard for implementing disciplinary

---

ordinary misconduct cases. *See, e.g., Mittra*, 316 N.J. Super. at 91, 719 A.2d at 697 ("Evaluation of student academic performance is a murkier subject. Academic evaluations of a student bear little resemblance to the type of inquiry traditionally performed by the courts. . . . Rigid application of contract principles to controversies concerning student academic performance would tend to intrude upon academic freedom and to generate precisely the kind of disputes that the courts should be hesitant to resolve.") It is possible that the New Jersey Supreme Court would assign courts a less limited role in reviewing ordinary misconduct cases.

[23]    *See Hernandez*, 322 N.J. Super. 1, 18, 730 A.2d 365, 374 ("The procedural rights inherent in membership with a private association, and the termination of that membership, are substantially less than those of a public school or public university student.").

sanctions is "the preponderance of evidence." (Compl. ¶¶ 41, 46-47) Plaintiffs allege that WPU "expelled Collick and Williams even though defendants' 'investigation' did not meet the preponderance of the evidence burden established in the Student Code of Conduct." (*Id.* ¶ 95) The Complaint specifically alleges that Defendants never corroborated the sexual assault allegations or spoke to potential witnesses (*Id.* ¶ 87), and that a grand jury did not find probable cause of criminal wrongdoing (*Id.* ¶ 110). Taken together, these allegations sufficiently plead that the procedures WPU followed were unfair or did not adhere to WPU's own rules. Therefore, the Complaint adequately states a claim for breach under the law of contract as interpreted by New Jersey courts in analogous contexts.[24]

Accordingly, defendants motion to dismiss Count Thirteen is denied.

### 6. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Fourteen)

In Count Fourteen, Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing against WPU, President Waldron, Director Fulleman, and other unknown defendants acting on their behalf. (Compl. ¶ 268) "There is no universally-accepted test for establishing a breach of the duty of good faith and fair dealing, but two elements appear to recur with some frequency: (1) the defendant acts in bad faith or with a malicious motive, (2) to deny the plaintiff some benefit of the bargain originally intended by the parties, even if that benefit was not an express provision of the contract." *Yapak, LLC v. Massachusetts Bay Ins. Co.*, No. CIV. 3:09-CV-3370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225, 864 A.2d 387 (2005);

---

[24]   Defendants argue that to the extent that this claim is asserted as a contract implied in law, the claim should be dismissed because the University is immune. (Def. Mot. at 51) They cite N.J. Stat. Ann. § 59:13-3, which precludes "any recovery against the State for claims based upon implied warranties or upon contracts implied in law." Because Defendants have failed to show on this motion that WPU is "the State" for immunity purposes, I need not address this question.

*Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251, 773 A.2d 1121 (2001)). In addition, "in the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Noye v. Hoffmann-La Roche Inc.*, 238 N.J. Super. 430, 433, 570 A.2d 12, 14 (App. Div. 1990).

Defendants argue that even if the relationship between WPU and its students constitutes an underlying contract,[25] Plaintiffs fail to allege a necessary element of the implied covenant: bad faith. The Complaint alleges, however, that Defendants, even if they observed the outward forms, discriminated against Plaintiffs and engineered a finding that Plaintiffs they were guilty of misconduct and should be expelled. That is a sufficient allegation of bad faith.  It may be that this cause of action is superfluous in light of the allegations of a straightforward breach of contract. Nevertheless, the motion to dismiss Count Fourteen is denied.

### 7. Intentional/Negligent Infliction of Emotional Distress (Counts Sixteen and Seventeen)

Count Sixteen asserts a claim on behalf of Collick and Williams for intentional infliction of emotional distress ("IIED") arising from Defendants' conduct in the criminal and disciplinary investigation and proceedings against Collick and Williams. Count Seventeen asserts a claim of negligent infliction of emotional distress ("NIED") on behalf of Collick and Williams. It adds a claim on behalf of Ms. Williams as well. (Compl. ¶ 284)

#### a. The NJTCA bar

There is a threshold issue under the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:1-1 *et seq.* The NJTCA precludes the recovery of damages from a "public entity or public employee for pain and suffering resulting from any injury," unless the plaintiff suffered "permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment

---

[25]    I note that, in *Moe v. Seton Hall University*, No. CIVA 2:09-01424, 2010 WL 1609680, at *10 (D.N.J. Apr. 20, 2010) (discussing student contract claims arising from university disciplinary action), the court denied the motion to dismiss the breach of good faith and fair dealing claim without discussion.

expenses are in excess of $3,600.00." *Id.* at § 59:9-2(d). Emotional distress claims, like others, are barred unless they stem from a "permanent debilitating or disfiguring physical injury," or "result in permanent physical sequelae such as disabling tremors, paralysis or loss of eyesight; that is, a 'permanent loss of a bodily function.'" *Srebnik v. State*, 245 N.J. Super. 344, 351, 585 A.2d 950, 954, 1991 WL 14995 (App. Div. 1991) (affirming dismissal of emotional distress claim); *see also Ayers v. Township of Jackson,* 106 N.J. 557, 576, 525 A.2d 287 (1987).

Plaintiffs do not dispute that Defendants are either public entities or public employees entitled to the protection of the NJTCA. The Complaint contains no allegation, plausible or otherwise, of debilitating or disfiguring physical injury, or of permanent loss of bodily function. The only remotely related allegation consists of a boilerplate reference to "physical . . . injuries" in the recitation of damages after each count. (*E.g.*, Compl. ¶¶ 280, 285) No such physical injuries are alleged or described, however.[26]

Plaintiffs correctly note that they need not satisfy the provisions of N.J. Stat. Ann. § 59:9-2(d) to the extent that an individual defendant's conduct "was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." (Pl. Opp. at 54 n.14) (quoting N.J. Stat. Ann. § 59:3-14). The IIED count contains a boilerplate allegation of malice and willful indifference; in context of the facts discussed above, it might pass the

---

[26]    Plaintiffs counter that New Jersey courts have held that emotional distress, without severe physical manifestations, may constitute a permanent loss of a bodily function in satisfaction of the NJTCA § 59:9-2(d) injury threshold. (Pl. Opp. at 54) (citing *Collins v. Union County Jail*, 150 N.J. 407, 413-20 (1997); *Frugis v. Bracigliano*, 351 N.J. Super. 328, 353-55 (App. Div. 2002), *aff'd in part and rev'd in part on other grounds*, 177 N.J. 250 (2003); *Randall v. State*, 277 N.J. Super. 192, 197 (App. Div. 1994)) However, in contrast to these cited cases, Plaintiffs have not alleged any specific permanent manifestations of severe emotional distress, let alone alleged any objective verifiable symptoms or professional verification or diagnosis. *See, e.g., Randall*, 277 N.J. Super. at 197 ("[N]ot only must there be verifiable objective manifestations of emotional distress, but those manifestations must be verified by physical examination and observation of a physician.") (quotations omitted).

46

NJTCA bar at the pleading stage. The NIED count, as would be expected, alleges only negligence, and hence does not surmount the NJTCA bar. Nevertheless, for the guidance of the parties, my substantive discussion will encompass both counts.

### b.    IIED (Count Sixteen)

To state a prima facie case for IIED, a plaintiff must plausibly assert that: 1) The defendant acted either intentionally to do the act and to produce emotional distress or acted "recklessly in deliberate disregard of a high degree of probability that emotional distress will follow"; 2) The defendant's conduct is so "extreme and outrageous . . . as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"; 3) The defendant's intentional or reckless conduct proximately caused the plaintiff's emotional distress; and 4) The plaintiff suffered emotional distress that is "so severe that no reasonable man could be expected to endure it." *Juzwiak v. Doe*, 415 N.J. Super. 442, 451, 2 A.3d 428, 433 (App. Div. 2010) (citing and quoting *Buckley v. Trenton Saving Fund Socy.*, 111 N.J. 355, 544 A.2d 857 (1988).)

Defendants state that their conduct could not have been "extreme or outrageous" because there was probable cause to arrest Collick and Williams; as stated above, however, the Complaint does plausibly allege a lack of probable cause. As for the emotional distress itself, the Complaint alleges that while in jail for nine days, "Both Collick and Williams were extremely scared and frightened for their lives . . . and they slept in shifts to attempt to protect one another." (Compl. ¶ 107) Additionally, they "have and will continue to suffer permanent and irreparable harm," including "immeasurable and permanent emotional and psychological trauma." (Compl. ¶¶ 113, 280, 285) Because severe emotional distress—though far from inevitable—is a plausible outcome of the situation as alleged, I will not require more in the way of concrete allegations to sustain the IIED claim. The motion to dismiss Count 16 is denied.

### c.   NIED (Count Seventeen)

As noted above, the NIED claim fails to pass the NJTCA bar. Particularly as to Ms. Williams, however, it has another flaw.

NIED has as an essential element that "plaintiff suffered severe emotional distress." *Dello Russo v. Nagel*, 358 N.J. Super. 254, 269–70, 817 A.2d 426, 435 (App. Div. 2003) (citing *Decker v. Princeton Packet,* 116 *N.J.* 418, 429, 561 A.2d 1122 (1989)). Where the distress consists of witnessing harm to another, the courts have set a high bar: the person harmed must be a close family member, and the injury must be severe. Ms. William's NIED claim, then, fails for the alternative reason that the Complaint does not allege that she observed a death or serious physical injury. *Trisuzzi v. Tabatchnik*, 285 N.J. Super. 15, 26, 666 A.2d 543, 548 (App. Div. 1995) (citing *Portee v. Jaffee*, 84 N.J. 88, 101, 417 A.2d 521 (1980)) ("the death or serious physical injury of another caused by defendant's negligence" is an essential element of the cause of action for negligent infliction of emotional distress from witnessing injury to a family member).

Accordingly, the motion to dismiss Count Sixteen (IIED) is denied, and the motion to dismiss Count Seventeen (NIED) is granted. Because Count 17 is the only Count in which Ms. Williams is named as a plaintiff, the Clerk shall terminate her as a party.

### 8. Negligence and Gross Negligence (Counts Eighteen and Nineteen)

In Counts Eighteen and Nineteen, Plaintiffs assert claims for negligence and gross negligence.

### a. The Elements

To prove negligence, a plaintiff must establish: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty of care; and (3) that the defendant's breach proximately caused the plaintiff's injury. *Boos v. Nichtberger,* 2013 WL 5566694, *4 (N.J. Super. Ct. App. Div. Oct. 10, 2013) (citing *Endre v. Arnold,* 300 N.J. Super. 136, 142, 692 A.2d 97

48

(App. Div. 1997)). The difference between "gross" and "ordinary" negligence is "one of degree rather than of quality." *Femicola v. Pheasant Run at Barnegat*, 2010 WL 2794074, *2 (N.J. Super. Ct. App. Div. July 2, 2010). Gross negligence is defined as "the want or absence of, or failure to exercise, slight care or diligence," *Draney v. Bachman*, 138 N.J. Super. 503, 509-510 (Law Div. 1976) (quoting *Oliver v. Kantor*, 122 *N.J.L.* 528, 532 (Sup. Ct. 1939), *aff'd* 124, *N.J.L.* (E. & A. 1941)), and the term "refers to behavior which constitutes indifference to consequences." *Griffin v. Bayshore Medical Center*, 2011 WL 2349423, *5 (N.J. Super. Ct. App. Div. May 6, 2011) (citing *Banks v. Korman Assocs.*, 218 N.J. Super. 370, 373, 527 A.2d 933 (App. Div. 1987)).

Read in the light most favorable to Plaintiffs, the Complaint alleges that Defendants owed Collick and Williams a duty of care. (Compl. ¶ 288) Further, Plaintiffs allege that Defendants "exhibited an extreme absence of and failure to exercise slight care or diligence" (*Id.* ¶ 294) and contains specific allegations that Defendants, *inter alia*, conducted investigations giving "little thought, if any, to the investigation and discovery of the actual facts involved" (*Id.* ¶ 22) and failing, allegedly at any point, to take basic investigatory steps including corroborating the allegations and speaking to potential witnesses. (*Id.* ¶ 87) Taken as true at the motion to dismiss stage, these allegations support a plausible inference of negligence and gross negligence.

### b. Charitable Immunity

Defendants argue that, even if Plaintiffs adequately state a claim for negligence, they are immune to suit on simple negligence grounds under the New Jersey Charitable Immunity Act ("NJCIA"), N.J.S.A. §§ 2A:53A–7 to –11.[27] "[A]n entity qualifies for charitable immunity when it '(1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable

---

[27] The NJCIA grants immunity for simple negligence, but not for grossly negligent conduct. *Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 97, 902 A.2d 900 (2006).

works.'" *O'Connell v. State*, 171 N.J. 484, 489, 795 A.2d 857, 860 (2002) (quoting *Hamel v. State,* 321 N.J. Super. 67, 72, 728 A.2d 264 (App. Div. 1999))

The parties' disagreement over the NJCIA centers on whether Collick and Williams were statutory "beneficiar[ies]" of WPU in the context of the criminal investigation and disciplinary process culminating in expulsion. Defendants argue that as students of WPU, engaging in educational pursuits, Collick and Williams are *per se* beneficiaries of WPU. (Def. Mot. at 58; Def. Reply at 22) (citing *O'Connell v. State*, 171 N.J. 484, 491, 795 A.2d 857, 861 (2002) (citing *Graber, supra,* 313 N.J. Super. at 484, 713 A.2d 503)) Plaintiffs counter that Defendants have failed to establish that, at the time of Defendants' alleged negligence, Plaintiffs were truly Defendants' beneficiaries. (Pl. Opp. at 62) (citing *Sommers v. Union Beach First Aid Squad*, 139 N.J. Super. 425, 431 (App. Div. 1976)

The briefing on this point was limited, and neither party addressed the applicability of more recent New Jersey case law that suggests that this issue requires a more intensive analysis than is possible on this motion to dismiss. In *Orzech v. Fairleigh Dickinson Univ.*, 411 N.J. Super. 198, 985 A.2d 189 (App. Div. 2009), the Appellate Division held that a university was entitled to immunity under the NJCIA in a wrongful death suit arising from the death of a student who fell to his death from a dormitory window while intoxicated. *Orzech* thoroughly analyzed precedent, including *O'Connell, Graber*, and *Sommers*, to determine whether the deceased student was a "beneficiary" of the university at the time of his fall. Synthesizing the law, it found that "beneficiary status turns on whether the charitable organization was performing its charitable works at the time of the accident, and the relationship at that time of the organization and the claimant." 411 N.J. Super. at 209, 985 A.2d at 195. *Orzech* also considered the educational benefits students derive from living in a dormitory. Although it ultimately concluded that "while living in a dormitory a student is a beneficiary, to some degree, of the university," 411 N.J. Super. At 209, 985 A.2d at 195, its legal and factual analysis suggests that New Jersey

courts might not categorically define Collick and Williams as WPU's beneficiaries simply because they were enrolled as students, without also considering whether they were truly engaged in and benefiting from educational pursuits at the time of the alleged negligence.

"Charitable immunity is an affirmative defense, as to which, like all affirmative defenses, defendants bear the burden of persuasion." *Abdallah v. Occupational Ctr. of Hudson Cty., Inc.*, 351 N.J. Super. 280, 288, 798 A.2d 131, 136 (App. Div. 2002); *see also Kain v. Gloucester City*, 436 N.J. Super. 466, 479, 94 A.3d 937, 945 (App. Div. 2014). Consequently, I cannot dismiss a complaint on a motion to dismiss unless it is clear from the face of the complaint that the immunity applies—*i.e.,* that plaintiffs have pled themselves out of court. The applicability of charitable immunity is not so clear.

Counts Eighteen and Nineteen state the elements of a claim, and the charitable immunity defense cannot be resolved on a motion to dismiss. Therefore, I will deny Defendants' motion to dismiss Counts Eighteen and Nineteen.

### 9. *Respondeat Superior* (Count Twenty)

In Count Twenty, Plaintiffs allege that WPU and the University Police "are responsible for the improper actions and conduct of their agents, employees, representatives, and/or servants who are individual defendants under the doctrine of vicarious liability." (Compl. ¶ 298) Defendants argue that the NJTCA, N.J.S.A. § 59:2-10, immunizes WPU and the University Police against *respondeat superior* liability for willful misconduct of its employees.[28]

As to malicious prosecution, Plaintiffs appear to agree. (Pl. Opp. at 60 n.18) The motion to dismiss on this ground is therefore granted as to Count Ten. As to the other tort claims that have survived this motion to dismiss, the

---

[28]    The parties agree that the institutional defendants are not vicariously liable on a *respondeat superior* theory for violations of § 1983 or the NJCRA. (Def.Mot at 60; Pl. Opp. at 58-59) I therefore understand Count 20 to be asserted only with respect to the State common law tort claims.

applicability of this defense to vicarious liability under the NJTCA will depend on the facts as they develop.

Accordingly, this component of the motion to dismiss is granted as to Count Ten, but denied as to all other counts.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED** as to Counts 11 and 17 in their entirety; Counts 1, 2, 3, 4, 6, and 8 to the extent they are based on racial discrimination or theories of substantive due process or equal protection/racial discrimination; Count 10 as to the *respondeat superior* liability of WPU and the University Police only; and Count 12 as to Plaintiffs' relationship with WPU only. However, Defendants' motion to dismiss is **DENIED** as to all other Counts and claims.

For ease of reference, the counts and claims that remain are: Counts 5, 7, 9, 13–16, and 18–21 in their entirety; Counts 1, 2, 3, 4, 6, and 8 to the extent they are based on gender discrimination or on Fourth Amendment, procedural due process, and equal protection/gender discrimination grounds; Count 10 to the extent it does not seek *respondeat superior* liability of WPU and the University Police; and Count 12 as to Plaintiffs' relationship with Educational Opportunity Fund Program.

This dismissal is without prejudice to the submission, within 30 days, of a proposed amended complaint that remedies the deficiencies identified here.

An appropriate Order follows.

Dated: November 17, 2016

HON. KEVIN MCNULTY, U.S.D.J.